1

2

3

4

5

6

7

8                             UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    KATHLEEN D. BURKS,                        No.  2:12-cv-1975 JAM AC PS

12                     Plaintiff,

13         v.                                    FINDINGS & RECOMMENDATIONS

14    KENNETH SALAZAR, Secretary of the
      Dep't of the Interior, ET AL.,

15
                      Defendants.
16

17         Before the court is defendant's January 22, 2014 motion for summary judgment (ECF No.

18    47).  Plaintiff opposes the motion.  On review of the motion, the documents filed in support and

19    opposition, and good cause appearing therefor, THE COURT FINDS AS FOLLOWS:

20                                     UNDISPUTED FACTS[1]

21    A.     Introduction

22           1.     General Background

23         The Bureau of Reclamation ("Reclamation") is a water management agency best known

24    for the dams, power plants, and canals that it constructed in the 17 western states, and it is the

25    largest wholesaler of water in the country.  ECF No. 48, Decl. of Katherine Thompson ¶ 3.

26    Reclamation's Mid-Pacific Region covers the northern two-thirds of California, most of western

27

28    [1] All facts are undisputed unless noted otherwise.

                                                  1

1    Nevada, and parts of southern Oregon.  Id. ¶ 4.  At the heart of the agency's mission, Reclamation

2    manages one of the largest water storage and conveyance systems in the world – the Central

3    Valley Project.  Id.  That system of 20 reservoirs and more than 500 miles of major canals and

4    aqueducts was built to tame the flood waters and irrigate the semi-arid acreage of California's

5    vast Central Valley.  Id.

6         Reclamation is tasked with recovering the federal investment in constructing, operating,

7    and maintaining the Central Valley Project.  Thompson Decl. ¶ 5.  It does this by setting rates for

8    water users that are calculated based on past, present, and future costs to Reclamation.  Id.

9    Because of the size and scope of the Central Valley Project, the rate-setting process is complex

10   and presents Reclamation with unique accounting challenges.  Id.; see also ECF No. 47-6, Decl.

11   of Lora Close ¶ 1 ("[Reclamation] has many unique public laws concerning how it does its

12   accounting.  [Reclamation] also has water customers that it deals with directly. . . .  This creates

13   accounting and rate-setting challenges unique to [Reclamation.]  That makes accounting work for

14   [Reclamation] very complicated.").

15        Reclamation's Finance Division plays a crucial role in accomplishing Reclamation's

16   mission.  Thompson Decl. ¶ 6.  The division supports Reclamation's cost-recovery objectives

17   through budgeting, accounting, water rate-setting, power accounting, and cost-analysis services.

18   Id.  At all times relevant to this action, the division consisted of three branches: Accounting,

19   Budget, and Rate-Setting.  Id.

20        2.    Assistant Regional Director Katherine Thompson

21        Katherine Thompson, a Caucasian woman, began her employ with Reclamation in 2004.

22   Thompson Decl. ¶ 2.  In late-2006 or early-2007, Thompson was promoted to the position of

23   Assistant Regional Director of Support Services for the Mid-Pacific Region.  Id.  In this position,

24   she oversaw five Reclamation divisions: Financial Management, Acquisitions, Information

25   Technology, Human Resources, and Administrative Services.  Id.

26        During Thompson's tenure at Reclamation, she supervised multiple managers, many of

27   whom came to understand that Thompson has very high expectations, which she applied to her

28   subordinates evenly.  See, e.g., ECF No. 47-13, Decl. of Yolanda Smith (formerly Yolanda

2

1   Wesson) ¶ 6 (African American woman born in 1971; "[She] expect[s] staff to be competent and

2   subject matter experts and to proactively learn about Reclamation's business and customers. . . . I

3   observed her to apply these expectations evenly to all her subordinates.  Though her high

4   expectations could sometimes cause stress, they were applied fairly to all."); ECF No. 47-11,

5   Decl. of Craig Muehlberg ¶ 7 (Caucasian man born in 1958; "In my experience with Thompson, I

6   observed that she has high expectations of her direct reports.  Though her high expectations can

7   cause stress, they are applied evenly to all of her subordinates."); Close Decl. ¶ 2 (Caucasian

8   woman, approximately 63 years old; "As a manager, Ms. Thompson has high expectations.  She

9   expects that people will do their jobs diligently, and she consistently monitors those she

10  supervises to ensure that that happens.  She gives out assignments, and she lets you know her

11  expectations. . . . I observed that Ms. Thompson consistently applied high expectations to all of

12  her subordinates."); ECF No. 47-9, Decl. of Julia McGinnis ¶ 4 (African American and Native

13  American woman born in 1981; "I observed that Thompson treated people fairly, applying the

14  same expectations to all her subordinates."); ECF No. 47-5, Decl. of Brenda Bryant ¶ 5 (African

15  American woman born in 1960; "[Thompson] is very dedicated and sets a high bar, higher than

16  people are used to, and some people react negatively to this. I observed that Thompson evenly

17  applies the same expectations to all her subordinates.").

18          3.      Thompson Hires Plaintiff as Financial Manager

19          As part of the reorganization leading to Thompson's promotion, Reclamation's upper

20  management decided to create a Mid-Pacific Region Financial Manager position.  Thompson

21  Decl. ¶ 7.  Modeled on such managers in other regions, the Financial Manager would oversee the

22  Mid-Pacific Region's Accounting, Budget, and Rate-Setting branches and would be responsible

23  for integrating their functions.  Id.  Thompson therefore initiated a search to find a person with the

24  skills and knowledge required to bring the Finance Division together as a team and effectively

25  tackle Reclamation's considerable financial and accounting challenges.  Id.

26          Thompson considered several applicants for the position, including plaintiff, who is

27  African-American, and two internal Caucasian candidates.  See Close Decl. ¶¶ 1, 5; Muehlberg

28  Decl. ¶¶ 2-3.  At the time, plaintiff was the Deputy Comptroller with the Department of

1   Homeland Security, Coast Guard in Alameda, California.  ECF No. 49, Pl.'s Opp'n at 3.[2]  In that

2   position, plaintiff oversaw approximately 50 staff members and managed an annual allocation of

3   $350 million.  Id.  As the Deputy Comptroller, plaintiff advised "the Command" of financial

4   issues, and she managed the distribution of grants and financial oversight.  Id.  Before working as

5   the Deputy Comptroller, plaintiff was the Financial Manager with the Department of Agriculture,

6   Food and Nutrition Service in San Francisco, California.  Id.  This position required plaintiff to

7   manage the $8 billion Special Nutrition Assistance Program, which included Food Stamp, Special

8   Nutrition, Nutrition Education, Child Nutrition, and Food Distribution for Tribal Organizations

9   for the Western United States.  Id.  Before that, plaintiff worked as an Administrative Officer with

10  the Department of Agriculture, Plant Protection and Quarantine, managing business services such

11  as human services, information management, budget and customer support.  Id.

12        Thompson ultimately chose plaintiff as the Mid-Pacific Region's Financial Manager.

13  Thompson Decl. ¶ 8.  Before extending an offer, Thompson met with plaintiff over lunch to

14  discuss the many challenges a Financial Manager would face.  Id.  Thompson initiated this

15  conversation to ensure that plaintiff understood that the Financial Manager job would be very

16  demanding, requiring critical thinking and proactive leadership and would involve accounting

17  problems significantly different from those that plaintiff faced previously.  Id.  Plaintiff disputes

18  this account, asserting that the only matters discussed were managing staff, bringing new

19  managers on board, providing direction, and unifying the team in the absence of supervisors.[3]

20  Pl.'s Opp'n at 5 ¶ C.  Plaintiff said that she was up for the job, and Thompson left the

21

22  [2] The Court notes that, pursuant to Rand v. Rowland, 154 F.3d 952, 953-54 (9th Cir. 1998) (en banc), and Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988), plaintiff was provided

23  with notice of the requirements for opposing a motion for summary judgment.  See ECF No. 47-3. This notice informed plaintiff that, to oppose a motion for summary judgment, she must set out

24  specific facts in declarations, depositions, answers to interrogatories, or authenticated documents. Plaintiff, though, does not submit any declarations with her opposition, including her own.

25  Therefore, the Court is must rely on plaintiff's statements that are included in the opposition itself, which creates an evidentiary problem because the opposition is not signed under penalty of

26  perjury.  See 28 U.S.C. § 1746.

27  [3] Plaintiff also states that she was asked how much longer she thought she would be working, suggesting to plaintiff that Thompson did not intend to have her working very long.  Pl.'s Opp'n

28  at 5 ¶ B.

1    conversation enthusiastic about plaintiff's ability to take charge and improve Reclamation's

2    financial processes.  Thompson Decl. ¶ 8.

3         Thompson wanted plaintiff to succeed as Financial Manager.  Thompson Decl. ¶ 9.  Not

4    only would this relieve Thompson of the burdens associated with managing the Finance

5    Division's personnel and day-to-day substantive priorities, it would also demonstrate to

6    Thompson's superiors that she had made the right choice.  Id.

7    B.    Plaintiff Begins Work as Financial Manager

8         In May 2007, plaintiff began work as Financial Manager.  Thompson Decl. ¶ 10.  In that

9    position, she was responsible for advising Reclamation's Regional Directors on financial issues

10   that impact Reclamation's work throughout the Mid-Pacific Region.  Id.  That included (1)

11   applying financial rules and statutes to Reclamation's contracts, (2) analyzing Reclamation's

12   business processes to eliminate inefficiencies, and (3) leading efforts to streamline service to

13   Reclamation's customers.  Id.; see also ECF No. 47-4, Decl. of Victoria Boesch, Ex. I (Financial

14   Manager Job Description and Major Duties).  She was also responsible for organizing, managing,

15   and directing all of the Mid-Pacific Region's financial management programs and activities,

16   including by developing and implementing annual and long-term strategic plans.  Thompson

17   Decl. ¶ 10.  Plaintiff managed approximately 55 Finance Division staff, with four high-level

18   managers and a secretary reporting directly to her.  Id.

19        Approximately six months before plaintiff's hire, Lora Close was reassigned to be

20   Assistant Financial Manager.  Close Decl. ¶ 4.  Close first began working for Reclamation in

21   2003 as an accountant and was promoted to Accounting Manager in 2004.  Id. ¶¶ 1, 3.  In her

22   newly reassigned position as Assistant Financial Manager, Close's duties were to help the

23   Financial Manager create a cohesive Finance Division out of the existing three units.  Id. ¶ 6.  At

24   the time of plaintiff's hire, Thompson encouraged plaintiff to consult with Close on a day-to-day

25   basis because Close had extensive experience with Reclamation accounting.  Thompson Decl. ¶

26   11.  Thompson also advised plaintiff to consult with Reclamation's contractor-accounting

27   systems expert, Julia McGinnis, because McGinnis's knowledge of systems solutions would help

28

1     plaintiff integrate financial functions.[4]  Id.

2         During plaintiff's first month, Thompson and others provided background materials to

3 help plaintiff acclimate.  Thompson Decl. ¶ 12.  These included the Managing for Excellence

4 Report, the Central Valley Water Project Association's briefing materials on financial issues, and

5 a comprehensive report evaluating the Mid-Pacific Region's financial systems and process.  Id.

6         In July and August 2007, Thompson coached plaintiff to begin actively participating in

7 meetings as the Finance Division's leader.  Thompson Decl. ¶ 13.  For example, Thompson

8 encouraged plaintiff to speak up at weekly Regional Management Team staff meetings and to

9 make sure that the team was aware of financial issues that were relevant to all managers.  Id.

10 When plaintiff failed to bring up any issues, Thompson asked her on one occasion to address

11 three specific issues, but again plaintiff did not do so.  Id.  In her opposition, plaintiff does not

12 address this specific incident.  See ECF No. 49, Pl.'s Opp'n at 6 ¶ F.  Instead, she states in a

13 conclusory fashion that she did inform the regional managers of relevant issues.  See id.

14         Around this time, Thompson also advised plaintiff to consult with her staff before

15 attending an August CFO Council meeting.  Thompson Decl. ¶ 14.  Thompson explained that the

16 CFO Council was Reclamation's financial oversight body, and that the Financial Manager's role

17 at its meetings was to ensure that the Deputy Chief Financial Officer understood the Region's

18 financial challenges and priorities.  Id.  Thompson claims that plaintiff came to the meeting

19 unprepared.  Id.  Though plaintiff states that she disputes this statement, see Pl.'s Opp'n at 6 ¶ G,

20 she does not address her level of preparedness at the August CFO Council meeting.  Rather,

21 plaintiff states generally that she would consult with her staff prior to meetings, oftentimes over

22 the phone.  Id.

23 ////

24 [4] Plaintiff disputes these statements.  See Pl.'s Opp'n at 5-6, ¶ E.  She claims that Close was
assigned to be Thompson's assistant beginning in April 2006 and that Thompson retained Close
25 as an assistant long after the position of Financial Manager was filled.  Id. Exs. A-C.  While
plaintiff's supporting exhibits establish that Close moved from the position of Accounting
26 Services Manager to Assistant Financial Manager sometime in mid- to late-2007, see Ex. A, and
that Close was included in various email chains addressing various projects, id. Ex. B, plaintiff
27 has not disputed Thompson's statement that she encouraged plaintiff to consult with Close,
though she does state that Thompson did not request that plaintiff consult with McGinnis.  Pl.'s
28 Opp'n at 6 ¶ E.

C.      Plaintiff's Performance Issues

  1.      Surnaming Problems

  Reclamation has an approval process called "surnaming" whereby subject matter experts review the Regional Director's formal correspondence as well as proposed contracts to ensure factual and technical accuracy.  Thompson ¶ 13.  One of the Financial Manager's duties is to sign off on such documents after vetting them for financial issues.  Id.  The vetting process would include, among other things, consulting with experts in the division to screen for significant financial risks such as non-compliance with financial standards and internal controls.  Id.

  As early as June 2007, Thompson noticed that plaintiff had approved documents with financial implications without appropriately identifying technical problems and financial risks. Thompson Decl. ¶ 14.  Thompson advised plaintiff that she must have appropriate subject matter experts review documents before approving them.  Id.  She then instructed plaintiff to have Close, the Assistant Financial Manager, review all documents before plaintiff approved them.  Id.  In the following months, Thompson noticed that plaintiff continued to approve documents posing financial risks.  Id.¶ 14.  When Thompson contacted Close to discuss the risks, she learned that plaintiff had not asked Close to review the documents before plaintiff approved them.  Id.  After this happened several times, a formal procedure was created requiring Finance Division review. Id.  Thompson found it necessary to create a formal process because plaintiff repeatedly failed to follow verbal instructions and failed to respond to Thompson's emails and verbal requests for information regarding specific document approvals.  Id.

  Plaintiff counters that it was she, in fact, who developed and implemented a surnaming routing process to assure Thompson that there was a consensus amongst managers in the Finance Division.  See Pl.'s Opp'n at 6-7 ¶¶ H-I, Ex. E.[5]

  2.      Failure to Respond to Email from Richard Stevenson

  On July 5, 2007, Richard Stevenson, Chief of the Water Rights and Contracts Branch, sent an email to plaintiff asking her to review a draft water service contract and provide finance-

---

[5] Plaintiff incorrectly identifies this document as Exhibit D.  See Pl.'s Opp'n at 6 ¶ H.

1    related feedback.  Thompson Decl. ¶ 18, Ex. B.  Stevenson noted that he was anxious to get the

2    contract out and asked for a response date.  Id.  On July 18, 2007, after failing to hear from

3    plaintiff, Stevenson sent a second email asking for an idea of when he can expect the review to be

4    completed.  Id.  On August 8, 2007, after again failing to receive a response, Stevenson sent a

5    third email to plaintiff, this time copying a number of high-level managers on the email thread,

6    including Thompson.  See id.  Thompson responded to Stevenson right away apologizing for the

7    delay and assuring him that the Finance Division would provide feedback within two days.  Id.

8    Thompson then met with plaintiff to see what had been done and learned that plaintiff had taken

9    no action.  Thompson Decl. ¶ 18.  Thompson then herself coordinated with Finance Division staff

10   to review the draft contract, forcing her to reschedule meetings and delay other work to resolve

11   the crisis.  Id.  Plaintiff's failure to respond to Stevenson and to assign staff to review the draft

12   water contract deeply concerned Thompson.  Id. ¶ 19.  Thompson states that plaintiff did not have

13   an explanation for her repeated failure to act.  Id.

14           Plaintiff admits that it was reasonable to expect a Financial Manager to respond to emails

15   such as those sent by Stevenson, that a failure to respond would be very concerning, and that

16   Thompson's distress over the failure to respond was reasonable.[6]  Pl.'s Depo. 259:6-14, 260:7-9,

17   262:1-5 [Boesch Decl. Ex. G, ECF No. 47-4 at 37-52].  Nonetheless, plaintiff asserts that she

18   spoke in person with Stevenson about getting subject matter expert review, and Stevenson

19   suggested several Finance Division employees to help get the review completed.  Pl.'s Opp'n at 7

20   ¶ J.  Plaintiff does not address her failure to respond to Stevenson's email and further fails to

21   address Thompson's need to coordinate with Finance Division staff to respond to Stevenson.

22           3.      Failure to Provide Managing for Excellence Action Plan by Deadline

23           On July 18, 2007, Michelle Light, the Regional Director's Chief of Staff, emailed plaintiff

24   _____

25   [6] Though plaintiff questions the completeness of the Stevenson email thread provided by
     defendant, see Pl.'s Depo. 261:9-21 [Boesch Decl. Ex. G, ECF No. 47-4 at 51], she fails to submit
26   any other copies of this email thread.  A party asserting that a fact is genuinely disputed must
     support the assertion by "citing to particular parts of materials in the record, including
27   depositions, documents, electronically stored information, affidavits or declarations, stipulations
     (including those made for purposes of the motion only), admissions, interrogatory answers, or
28   other materials."  Fed. R. Civ. P. 56(c)(1)(A).

(and copied Thompson) asking for a financial-initiative Managing for Excellence implementation plan.  Thompson Decl. ¶ 20, Ex. C.  The email set an August 6, 2007 deadline for a response from plaintiff since the Region's response was due on August 10, 2007.  Id.  When Thompson asked plaintiff about this project on August 10, 2007, she learned that plaintiff had done nothing towards completing the assignment.  Thompson Decl. ¶ 20.  Thompson then worked with Burks to assign the matter to a staff member, who had to work on Saturday to complete the project (August 10, 2007 was a Friday).  Id.  Thompson explained to plaintiff that her failure to act promptly had created an otherwise unnecessary Saturday assignment and made the entire Region's response late.  Id.

Plaintiff admits that the response was late, but states that Light explained that the Managing for Excellence Plan was previously updated by Thompson on a monthly basis.  See Pl.'s Opp'n at 7 ¶ K.  Plaintiff fails to explain, however, why she did not respond to Light's email or update the Plan herself when asked to do so.

4.  Decline in Quality and Reliability of Plaintiff's Work

Thompson developed further reservations regarding the quality and reliability of plaintiff's work in September 2007.  Thompson Decl. ¶¶ 21-22.  First, plaintiff provided a San Luis Drainage Draft Legislation Briefing that both incorrectly stated that certain measures would impose costs on the Region, when in fact they would create a savings, and failed to adequately analyze the impacts of the subject legislation.  Id. ¶ 21.  At the meeting on this issue, neither plaintiff nor any of her staff were able to explain the reasoning behind the Finance Division's conclusions.  Id.  Following this meeting, Thompson sent plaintiff an email asking for an updated, accurate analysis, and telling plaintiff that she was expected to come to meeting with complete and accurate analyses that either she or a staff member could coherently discuss.[7]  Id.

In late-September 2007, a problem regarding power-revenue accounting emerged.

---

[7] In her opposition, plaintiff states that she may have attended this meeting, but she did not present a brief since subject matter experts and Branch Chiefs typically make such presentations.  Pl.'s Opp'n at 7 ¶ I.  But neither plaintiff's opposition nor her submitted documents refute Thompson's statements.  See id. Ex. F (late-July 2007 email exchange discussing the San Luis Unit facilities; an edited draft of a contract between the United States and Pacheco Water District providing project water service from San Luis Unit and Delta Division).

1   Thompson Decl. ¶ 22.  This issue was so significant that the Bureau of Reclamation's Chief

2   Financial Officer traveled to the Region from Washington D.C. for an in-person briefing.  Id.  On

3   Friday, September 28, at 4 p.m., Thompson met with Burks and key staff to analyze certain

4   transactions at issue for a Monday meeting with the Chief Financial Officer.  Id.  As these

5   discussions continued, plaintiff left the meeting to pick up her husband at the airport.  Id.

6   Plaintiff then did not participate in continuing discussions over the weekend between Thompson

7   and other staff members, despite being copied on emails, and she missed a Monday morning

8   conference that developed a resolution to the revenue-recognition problem just before the meeting

9   with the Chief Financial Officer.  Id.  When Thompson asked plaintiff why she did not participate

10  while the Finance Division grappled with an urgent and substantial problem, plaintiff responded

11  that meetings are not an effective way to resolve issues.  Id. ¶ 23.  When Thompson asked for an

12  alternate approach, she claims that plaintiff did not respond.[8]  Id.

13          5.      Further Performance Issues

14          In October 2007, Thompson became further dissatisfied with plaintiff's reliability.  See

15  Thompson Decl. ¶¶ 26-27.  For example, on October 10, 2007, Thompson sent plaintiff an email

16  asking her to provide comments by October 18, 2007, on a draft letter regarding a COMB Water

17  Project.  Id. ¶ 26, Ex. F.  Thompson claims that plaintiff did nothing.  Id. ¶ 26.  Plaintiff counters

18  that the document was routed to the Branch Chiefs for review and comment.  Pl.'s Opp'n at 8 ¶

19  O.

20          Also in October 2007, Thompson assigned plaintiff to draft a letter responding to the

21  Kanawha Water District's claim for a refund.  Thompson Decl. ¶ 27.  After plaintiff circulated a

22  draft for comment, Thompson verbally directed her to provide a final product before leaving for a

23  business trip on October 26, 2007.  Id.  Plaintiff told Thompson that the letter was being reviewed

24  for approval by the Resources Management Division.  Id.  When plaintiff later failed to provide

25  [8] Plaintiff disputes this account, but again fails to address the substance of Thompson's
    statements.  She states only that she attended this meeting, that Thompson reacted to
26  "POTENTIAL" debt issues, that the end of September and first week of October are a busy time
    for Finance Division staff, and that numerous scheduled and impromptu meetings were held.
27  Pl.'s Opp'n at 7-8 ¶¶ M-N.  Plaintiff claims that she told Thompson that, in light of the numerous
    meetings, it was very difficult to be in two places at once, "attending the meetings and following
28  up on the actions and then bringing those actions and activities to to [sic] a close."  Id. at 8 ¶ N.

1  the final letter, Thompson discovered that plaintiff had not in fact submitted it to the Resources

2  Management Division for review.  Id.  Thompson then learned from plaintiff's staff that

3  plaintiff's draft letter did not analyze the refund issue.  Id.  Thompson therefore was forced to

4  meet with Finance Division staff to devise appropriate substantive content for the letter and get it

5  out.  Id.; see also id. Ex. G.  In opposition, plaintiff asserts only that there were two letters from

6  the Kanawha Water District, one sent to the Financial Manager and the other to the Regional

7  Director a few days later.  Pl.'s Opp'n at 8 ¶ P.  Plaintiff submits as evidence the draft letter sent

8  to Thompson, and states that she responded to the Financial Manager letter and was unaware of

9  the letter to the Regional Director.  Id., Ex. H.[9]

10  Additionally, Thompson declares that plaintiff failed to prepare an assigned presentation,

11  did not participate in a discussion of her division's budget, and missed another Managing for

12  Excellence deadline.  Thompson Decl. ¶ 28, Exs. H-J.  Plaintiff does not address her failure to

13  prepare an assigned presentation or the second missed Managing for Excellence deadline.

14  Instead, as to her participation in discussions of her division's budget, plaintiff states generally

15  that she worked with a budget technician and other budget staff each year on the Finance Division

16  budget.  Pl.'s Opp'n at 8 ¶ Q.

17  The performance problems that Thompson observed were also observed by others in

18  Reclamation.  See, e.g., Smith Decl. ¶ 8 ("In many meetings, I observed Thompson asking

19  [plaintiff] substantive financial questions that [plaintiff] was unable to answer. . . . [Plaintiff]

20  usually stuttered, stammered, and looked uncomfortable in response to Thompson's questions.

21  Though I believed it was fair for Thompson to expect the Financial Manager to address such

22  issues, I never saw [plaintiff] able to substantively discuss critical financial issues on her own

23  without addressing the issue to a subordinate."); Muehlberg Decl. ¶¶ 5-6 ("[Plaintiff] did not take

24  a leadership role in . . . meetings and did not really participate. [¶] As time went on, in meetings, I

25  observed that Thompson appeared frustrated by [plaintiff]'s inability to answer pressing questions

26  regarding financial issues and by [plaintiff]'s lack of understanding of Reclamation accounting.").

27

28  [9] Plaintiff incorrectly identifies this document as Exhibit I.  See Pl.'s Opp'n at 8 ¶ P.

In late-2007, either Thompson or plaintiff came up with an idea to have plaintiff work with a couple of successful and experienced Financial Managers in other regions. Thompson Decl. ¶ 29; Pl.'s Opp'n at 8 ¶ R. Thompson believed this would give plaintiff the opportunity to observe first-hand the type of work that would make her successful. Thompson Decl. ¶ 29. She felt this was particularly important because of plaintiff's lack of participation in the Finance Division's October 2007 budget discussions. Id. Thompson claims she broached the subject of having plaintiff shadow other regions' Financial Managers at an October 26, 2007 meeting. Id. Thompson declares that she told plaintiff that her first assignment would be to go to the Upper Colorado Region to work with the Financial Manager in Salt Lake City during the last week of November. Id. Plaintiff claims there was no mention of specific dates during that meeting. Pl.'s Opp'n at 8 ¶ R.

   6.      Thompson's Expectations for Plaintiff

Thompson believed that plaintiff's failure to engage rendered her minimally successful (at best) on her performance plan's communications and customer service elements. Thompson Decl. ¶ 30. In addition to missed deadlines and unanswered customer requests, Thompson found that plaintiff's staff continually looked to Thompson rather than plaintiff for direction. Id.; see also McGinnis Decl. ¶ 6 ("[Plaintiff] did not seem to understand finance-related concepts. As a consequence, I was never able to go to [plaintiff] with substantive issues"); Smith Decl. ¶ 5 ("[Plaintiff] did not give me the type of guidance that I needed and that I believed appropriate for my immediate supervisor and the manager of the Finance Division."), id. ¶ 11 ("[Plaintiff] did not provide substantive guidance to me or other subordinates. She also did not provide leadership or address substantive issues in meetings."); Close Decl. ¶ 7 ("During the June 2007 to November 2007 time period, [plaintiff] . . . gave me no guidance regarding my work or her expectations."), id. ¶ 9 ("[Plaintiff] gave me no assignments.  I found [plaintiff] uncommunicative and unresponsive."), id. ¶ 11 ("During all the time I worked under [plaintiff], I observed that she did not appear to have a firm grasp of pertinent financial standards or appropriation law."). Thompson therefore met directly with Finance Division staff to make assignments, monitor progress, direct their work, and answer their questions. Thompson Decl. ¶ 30. This required

12

1    Thompson to forgo other high-priority tasks and work after regular business hours.  Id.

2            To improve the situation, Thompson provided verbal and written guidance, the latter via

3    email dated November 6, 2007, to plaintiff regarding her communications and customer-service

4    expectations.  Thompson Decl. ¶ 31, Ex. K.  These expectations included, inter alia, responding to

5    emails within one business day unless the email is informational; to confer with Thompson after

6    each meeting on all financial issues to ensure agreement with assignments and next steps; brief

7    RMT on financial issues at staff meetings; have daily check-ins or more frequent communications

8    with the ARD; verbally debrief after each significant financial meeting to further confer with the

9    ARD on next steps; and respond to contractor communications within five workdays.  Id. Ex. K.

10   With this list of expectations, Thompson hoped that, by increasing her level of oversight of

11   plaintiff's work, she could avoid more missed deadlines resulting from plaintiff's failure to assign

12   work to her staff.  Id. ¶ 31.

13           7.      Thompson's Continued Frustration with Plaintiff's Performance

14           On November 7, 2007, plaintiff received an email from the Regional Liaison asking for

15   ACWA issue papers by November 13, 2007.  Thompson Decl., Ex. L.  Two days later, Thompson

16   emailed plaintiff to check on the status of her response.  See id.  Plaintiff purportedly failed to

17   respond to either email.  Thompson Decl. ¶ 32.  After the deadline passed, Thompson again

18   intervened to get the work done.  Id.  Thompson claims that plaintiff did nothing to help complete

19   the assignment and took no responsibility for her inaction.[10]  Id.

20           Then, on November 14, 2007, plaintiff attended a Battle Creek meeting at Thompson's

21   direction.  Thompson Decl. ¶ 34.  Thompson asked plaintiff to confer with her following the

22   meeting so that Thompson could explain the pertinent financial issues to allow plaintiff to take

23   the lead on them.  Id.  Plaintiff, however, did not talk to Thompson after the meeting as

24   instructed.  Id.  When Thompson asked plaintiff why, plaintiff stated that everyone was in

---

25   [10] Plaintiff does not address this incident specifically, and instead submits two tables, one titled
26   "Fall 2007 ACWA" and the other titled "Spring 2008 ACWA Assignments."  See Pl.'s Opp'n at
     9 ¶ T, Ex. J.  The relevance of these tables is unclear since they are submitted without any
27   explanatory information.  Plaintiff also states generally that she developed all assigned issue
     papers, Pl.'s Opp'n at 9 ¶ U, but in support submits draft documents that are either facially
28   irrelevant, undated, pre-date the November 2007 request for AWCA issue papers by one month,
     or post-date the request by up to one year.  See id., Ex. K.

1    agreement when the meeting concluded.  Id.  Per Thompson, this illustrated plaintiff's

2    inattentiveness since the parties' lack of agreement was one of the meeting's primary topics.  Id.;

3    see also id. Ex. M (email from Thompson to plaintiff, November 18, 2007).

4    D.    Plaintiff's Meeting with Mike Finnegan

5         On November 14, 2007, plaintiff met with Acting Deputy Regional Director Mike

6    Finnegan.  See Thompson Decl. ¶ 33.  The purpose of this meeting was to discuss

7    communications between Thompson and plaintiff.  Id.  Finnegan allegedly advised plaintiff to

8    meet with Thompson to discuss the issue.  Id.

9    E.    Plaintiff's Reassignment

10        On November 15 and 16, 2007, the Finance Division held off-site strategy planning

11   sessions to develop a mission statement and to identify financial roles and responsibilities.

12   Thompson Decl. ¶ 35.  Thompson claims that plaintiff participated very little in these meetings,

13   while plaintiff claims that she participated as much as the other managers in attendance.  Id.; Pl.'s

14   Opp'n at 9 ¶ Y.  During these meetings, Thompson came to understand that the managers

15   reporting to plaintiff believed plaintiff's lack of knowledge regarding Reclamation finance

16   significantly hindered her work as a financial manager.  Thompson Decl. ¶ 35; see also supra.

17   Accordingly, Thompson began to plan an intensive developmental assignment to help plaintiff

18   "get on the fast track."  Thompson Decl. ¶ 35. This assignment would temporarily relieve plaintiff

19   of day-to-day management duties as Financial Manager and give her time to study Reclamation

20   finance so she could build a solid foundation that would give her the confidence to lead the

21   Finance Division.  Id.

22   F.    The Salt Lake City Meeting

23        As previously noted, either Thompson or plaintiff decided that the latter could benefit

24   from shadowing other regions' Financial Managers, giving plaintiff the opportunity to observe

25   first-hand the type of work that would make her successful.  Thompson claims she first broached

26   the subject at an October 26, 2007 meeting when she told plaintiff that her first assignment would

27   be to go to the Upper Colorado Region to work with the Financial Manager in Salt Lake City

28   during the last week of November.  Plaintiff denies that they discussed a date at this meeting.

On November 18, 2007, Thompson sent plaintiff an email outlining her expectations for plaintiff's Salt Lake City trip the next week. Thompson Decl. ¶ 36, Ex. O. On Monday, November 19, 2007, plaintiff told Thompson that she could not attend the Salt Lake City budget meeting because she had a personal class each night that week that conflicted. Id. ¶ 36. Thompson responded via email on November 20, 2007, stressing the importance of plaintiff's attendance in Salt Lake City and informing plaintiff that there would be consequences if she did not attend. Id., Ex. Q. Plaintiff responded that personal financial obligations and also work duties prevent her from making the trip. Id. The next day, on November 21, 2007, Thompson sent another email to plaintiff informing her that she was required to go on the planned trip. Thompson Decl. Ex. P. In response, plaintiff accused Thompson of harassment. Id. Plaintiff did not attend the Salt Lake City meeting. Instead, she called in sick on that Monday and Tuesday with a migraine headache. Pl.'s Depo. at 302: 22-24 (Boesch Decl. Ex. H, ECF No. 47-4 at 54).

Plaintiff disputes all of Thompson's statements regarding the Salt Lake City trip. Pl.'s Opp'n at 9-10 ¶ Y. Though she fails to address the content of the emails submitted by Thompson, plaintiff contends that she did not have a problem traveling, as evidenced by her travel log, see id. Ex. N, but states that traveling was difficult because she wearing a heart monitor and was undergoing medical tests, id. Ex. O.[11]

G.    The Individual Development Plan

On November 30, 2007, Thompson presented plaintiff with an Individual Development Plan ("IDP"), which was to span four months and had as its objective "[t]o provide sufficient training and development activities to enable plaintiff to function effectively as the regional financial manager." Thompson Decl. ¶ 37, Ex. R; see also id. Ex. S. Thompson spoke to plaintiff about the IDP and incorporated some of her suggestions. Id. During the period of the IDP, Susan Hoffman was selected to serve as the Interim Financial Manager who would handle the day-to-day management of the Finance Division. Id.

On December 7, 2007, Thompson met with plaintiff to discuss the latter's progress under

---

[11] In support, plaintiff submits only an August 2007 email that she sent to Thompson requesting leave on two days for doctor's appointments. See Pl.'s Opp'n Ex. O.

1   the IDP.  Thompson Decl. ¶ 38.  In the progress review report, called the Supervisory Employee

2   Performance Appraisal Plan, Thompson rated plaintiff minimally successful.  Id., Ex. T.  She

3   noted that plaintiff's communication competencies have been ineffective, that plaintiff was

4   completely nonresponsive on important financial matters, that she did not respond to verbal or

5   email supervisory instruction, that she missed deadlines, and that there was evidence of customer

6   dissatisfaction.  Id.  In support, Thompson referred to many instances of plaintiff's subpar

7   performance, including her August 2007 and October 2007 failure to provide Managing for

8   Excellence financial action plans by the deadline, her July 2007 failure to respond to an email

9   from Richard Stevenson asking her to review a draft water service contract and provide finance-

10   related feedback, her October 2007 failure to respond to the Kanawha District's request for a

11   refund, her failure to respond to the November 2007 email from the Regional Liaison to respond

12   to the ACWA issue papers, and lastly, plaintiff's failure to attend the Salt Lake City meeting

13   despite direct orders to attend.  See id.  Plaintiff refused to sign this progress report.  See id.

14   H.   Plaintiff's December 2007 Complaint of Discrimination

15   On December 3, 2007, plaintiff met with EEO Counselor Wilber "Louis" Moore to

16   discuss a complaint of discrimination against Thompson.  See ECF No. 47-8, Decl. of Kevin

17   Mack Ex. B (Pl.'s EEO Complaint).  Moore then reached out to John Davis, the then-Acting

18   Regional Director, on December 7, 2007, to inform him of the meeting.  ECF No. 47-7, Decl. of

19   John Davis ¶ 5.

20   Davis then met with Thompson.  Davis Dec. ¶ 5; Thompson Decl. ¶ 39.  At this meeting,

21   Davis and Thompson discussed plaintiff's performance problems and Thompson's attempts to

22   help plaintiff improve her work performance.  Davis Decl. ¶ 5.

23   On December 11, 2007, plaintiff sent Davis a memo detailing her complaints against

24   Thompson; Davis received this memo on December 14, 2007.  Davis Decl. ¶ 6, Ex. B.  Because

25   the memo referred to plaintiff's meeting with Mike Finnegan concerning "the disparate,

26   harassing, and inappropriate behavior of [plaintiff's] superior," Davis contacted Finnegan.  Davis

27   Decl. ¶ 6.  Finnegan allegedly told Davis that plaintiff did not raise such concerns, but instead

28   spoke to him about communication issues.  Id.  Per Davis, Finnegan counseled Davis to speak to

1    Thompson.  <u>Id.</u>

2         On December 14, 2007, Davis met again with Thompson.  Davis Decl. ¶ 6.  Davis asked

3    Thompson directly whether plaintiff's meeting with Finnegan caused her to move plaintiff out of

4    her position, to which Thompson responded "No."  <u>Id.</u> ¶ 7.  Thompson explained that she had

5    serious concerns regarding plaintiff's performance dating back to October and that feedback from

6    the mid-November Finance Division strategy meeting convinced Thompson that plaintiff needed

7    a structured development plan.  <u>Id.</u>; Thompson Decl. ¶ 39.  The purpose of the IDP was to help

8    plaintiff understand her role as Financial Manager.  Davis Decl. ¶ 7; Thompson Decl. ¶ 39.  Davis

9    reviewed the IFP and concluded that the activities that plaintiff was asked to perform were

10   reasonable.  Davis Decl. ¶ 7.

11   I.     <u>Denial of Within-Grade Increase in Pay</u>

12        In early 2008, plaintiff provided Thompson with a list of plaintiff's accomplishments for

13   2007.  Thompson Decl. ¶ 40, Ex. U.  Plaintiff and Thompson went back and forth on this list,

14   with Thompson expressing numerous concerns to plaintiff regarding both the substance and

15   quality of the information provided by plaintiff.  <u>See id.</u>, Ex. V.  For example, Thompson noted

16   that many of the accomplishments identified by plaintiff consisted of attending and setting up

17   meetings, conveying information plaintiff's staff had developed, and carrying out other

18   administrative tasks.  Thompson Decl. ¶ 40.  Thompson believed that plaintiff's list also included

19   items that she had not completed and that she had taken credit for the accomplishments of others.

20   <u>Id.</u>  Plaintiff counters that supervisors typically list as their accomplishments those done

21   personally as well as those done in conjunction with their staff.  Pl.'s Opp'n at 10 ¶ Z.  On

22   February 12, 2008, Thompson asked for a response by February 13, 2008 to the issues she raised

23   regarding plaintiff's accomplishments.  Thompson Decl. Ex. V.  Plaintiff did not respond to this

24   email.  Thompson Decl. ¶ 40.

25        On February 21, 2008, because plaintiff had not identified significant accomplishments

26   that altered Thompson's earlier analysis, Thompson finalized plaintiff's rating for 2007 as

27   minimally successful.  <u>Id.</u>  Based on this minimally successful rating, plaintiff's within-grade

28   increase in pay was denied on May 30, 2008.  <u>Id.</u>, Ex. W.

1    J.      Plaintiff's Performance Reviews

2           In May 2008, Thompson provided plaintiff with a Supervisory Assessment of her work

3    during the prior five-month IDP period.  Thompson Decl. ¶ 42, Ex. Y.  In this assessment,

4    Thompson noted that plaintiff has "consistently been incapable of demonstrating a basic

5    understanding of governing accounting principles, concepts, and standards. [Plaintiff] is unable to

6    articulate, to any degree, this governing guidance."  Id. Ex. Y.  Thompson also noted that, despite

7    5 months in a concentrated learning plan, plaintiff continued to display unfamiliarity with the

8    federal appropriation used to fund Reclamation's mission.  Id.  Lastly, Thompson noted that

9    plaintiff's written products are difficult to follow, contain irrelevant and inaccurate information,

10   and are generally unsuitable for executive-level communications.  Id.

11          On June 30, 2008, Thompson provided plaintiff with another Supervisory Employee

12   Performance Appraisal Plan, wherein Thompson again rated plaintiff as performing at a less than

13   satisfactory level.  Thompson Decl. ¶ 42, Ex. Z.

14   K.      Five-Day Suspension

15          Based on plaintiff's failure to follow Thompson's directions to attend the Salt Lake City

16   Budget meeting and to provide her with an adequate response to the Kanawha Water District's

17   refund request, Thompson proposed on January 14, 2008 that plaintiff receive a five-day

18   suspension without pay.  Thompson Decl. ¶ 41, Ex. X.  Thompson felt this was important to get

19   plaintiff's attention because plaintiff did not seem to understand the importance of completing

20   assigned tasks or following supervisory direction.  Id. ¶ 41.  Thompson believed it was important

21   to hold plaintiff formally accountable.  Id.

22          Plaintiff responded to this proposal by letter and also met with Frank Michny, the

23   Assistant Regional Director for the Bureau of Reclamation's Mid-Pacific Region.  ECF No. 47-

24   10, Michny Decl. ¶ 4, Exs. A-B.  After giving plaintiff a chance to tell her side of the story,

25   Michny upheld the suspension on February 20, 2008, because the evidence showed that plaintiff

26   failed to comply with Thompson's direct order to attend the Salt Lake City budget meeting and

27   that she failed to complete the Kanawha Water District response as Thompson directed.  Id., Ex.

28   C.

On March 13, 2008, plaintiff filed a formal administrative grievance regarding her suspension.  Schulz Decl., Ex. A.  Plaintiff also made an oral presentation to Elizabeth Ann Rieke, Area Manager, on May 4, 2008, to present her position.  Id., Ex. B.  On May 10, 2008, Rieke also upheld the 5-day suspension for failure to follow a direct order and failure to complete an assigned task.  Id.

L.      Plaintiff's Transition Back to Full Financial Manager Responsibilities

Despite plaintiff's performance issues, Thompson planned to transition her back to full Financial Manager responsibilities.  Thompson Decl. ¶ 43.  In order to prepare plaintiff for the transition, Thompson instructed her in late-May and again in mid-June to obtain briefings on the Finance Division's current workload.  Id.  On June 27, 2008, Thompson, plaintiff, and Hoffman (the Acting Interim Financial Manager) met to collaboratively formulate an agreement for a Financial Manager transition with the help of a facilitator from Positive Impact Consulting.  Id.  Based on the Transition Charter they drafted together, Thompson prepared a July 15, 2008 letter of expectations emphasizing the important of communication and collaboration.  Id., Ex. AA.

Shortly thereafter, on July 24, 2008, Thompson issued a Letter of Counseling to plaintiff in light of the latter's failure to obtain briefings on the Finance Division's current workload as previously instructed.  Thompson Decl. ¶ 43, Ex. BB.  In this letter, plaintiff was warned that failure to follow Thompson's direction will be considered insubordination and may result in the initiation of formal disciplinary action.  Id.

M.      Unsatisfactory Performance Rating

In January 2009, Thompson completed another Supervisory Employee Performance Appraisal Plan, giving plaintiff an unsatisfactory rating based on failure to complete assignments, poor leadership, and substandard work.  Thompson Decl. ¶ 44, Ex. CC.  Thompson also discussed the problems identified in the Appraisal Plan with plaintiff.  See id., Ex. DD.  Plaintiff disagreed with the evaluation and refused to sign it.  See id.  From February through May 2009, plaintiff continued to produce work product that Thompson found inadequate.  See Thompson Decl. ¶ 44, Exs. EE-KK.

////

1    N.    <u>Plaintiff's Transfer to New Position</u>

2        In June 2009, Thompson removed plaintiff from the Financial Manager position and

3    transferred her to a position in which she would coordinate the Region's Internal Control

4    Program.  Thompson Decl. ¶ 45, Ex. LL.  Thompson did this because she did not believe that

5    plaintiff could performance the Financial Manager job in a way that avoided significant financial

6    risk for Reclamation.  <u>Id.</u> ¶ 45.  She also did this because plaintiff continued to produce untimely

7    and inaccurate work and failed to provide leadership that Thompson thought was necessary for

8    the Financial Division.  <u>Id.</u>  In plaintiff's new position, she continued to receive the same pay and

9    benefits.  Thompson Decl. ¶ 45.

10       Thompson appointed Assistant Financial Manager Lora Close to step in as Acting Interim

11   Financial Manager while Thompson looked for a replacement for plaintiff.  Thompson Decl. ¶ 46.

12   In late-2010, Thompson chose Brenda Bryant, an African-American woman, as the Region's new

13   Financial Manager.  <u>Id.</u>; Bryant Decl. ¶ 2.  Per Thompson, Bryant has done an excellent job as a

14   Financial Manager during the three years that Thompson supervised her.  Thompson Decl. ¶46.

15   O.    <u>The EEOC Proceedings</u>

16       On January 22, 2008, plaintiff filed a complaint of discrimination based on her race

17   (African-American), color (light complexion), and age (date of birth, February 13, 1956).  Mack

18   Decl. Ex. B.  An administrative hearing was held on March 17 and 18, 2010.[12]  <u>Id.</u> Ex. A.  On

19   February 3, 2012, administrative law judge Jeanne M.L. Player issued an order finding no

20   evidence of discrimination, retaliation or hostile work environment.  Mack Decl. Ex. A.

21                          PRODUCEDURAL BACKGROUND

22       Plaintiff initiated this action on May 4, 2012 in the Northern District of California.

23   Following transfer to this court on July 30, 2012 and upon grant of defendant's motion to dismiss,

24   <u>see</u> ECF No. 36, this matter is now proceeding on a first amended complaint filed January 2,

25   2013, ECF No. 33.  Plaintiff brings suit for discrimination based on race (African-American),

26   color (light complexion), age (date of birth, February 13, 1956), and reprisal (for participation in

27   _____

[12] At the hearing, plaintiff dropped her claim of discrimination based on color.  Michny Decl. Ex.
28   A at 2 n.1.

1    the EEO process).  Plaintiff also asserts a claim for hostile work environment.

2          On May 10, 2013, a pretrial scheduling order issued setting June 27, 2014 as the date for

3    the pretrial conference and September 8, 2014 as the trial date.  ECF No. 41.  These dates have

4    now been continued to August 22, 2014 and October 27, 2014, respectively.  See ECF No. 54.

5          On January 22, 2014, defendant filed the instant motion for summary judgment, which

6    plaintiff opposes.

7                                    LEGAL STANDARDS

8          "A party may move for summary judgment, identifying each claim . . . or the part of each

9    claim . . . on which summary judgment is sought.  The court shall grant summary judgment if the

10   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

11   judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that could affect the

12   outcome of the suit under the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477

13   U.S. 242, 248 (1986).  For a dispute to be "genuine," a reasonable jury must be able to return a

14   verdict for the nonmoving party.  Id.

15         The moving party's burden on summary judgment depends on whether it bears the burden

16   of proof at trial with respect to the claim or defense at issue.  When the party moving for

17   summary judgment would bear the burden of proof at trial, it must come forward with evidence

18   which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  See

19   C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc., 213 F.3d 474, 480 (9th Cir.

20   2000).  In such a case, the moving party has the initial burden of establishing the absence of a

21   genuine issue of fact on each issue material to its case.  Id.  However, if the nonmoving party

22   bears the burden of proof on an issue at trial, such as an affirmative defense, the moving party

23   need not produce affirmative evidence of an absence of fact to satisfy its burden.  Celotex Corp.

24   v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may simply point to the absence of

25   evidence to support the nonmoving party's case.  Id.

26         Once the moving party has met its burden, the burden then shifts to the nonmoving party

27   to designate specific facts showing a genuine issue for trial.  Celotex, 477 U.S. at 324; Anderson,

28   477 U.S. at 256 ("a party opposing a properly supported motion for summary judgment may not

1    rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that

2    there is a genuine issue for trial.").  A party asserting that a fact is genuinely disputed must

3    support the assertion by "citing to particular parts of materials in the record, including

4    depositions, documents, electronically stored information, affidavits or declarations, stipulations

5    (including those made for purposes of the motion only), admissions, interrogatory answers, or

6    other materials."  Fed. R. Civ. P. 56(c)(1)(A).

7         To carry its burden, the nonmoving party must show more than the mere existence of a

8    scintilla of evidence, Anderson, 477 U.S. at 252, and "do more than simply show that there is

9    some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith

10   Radio Corp., 475 U.S. 574, 586 (1986).  In fact, the nonmoving party must come forward with

11   affirmative evidence from which a jury could reasonably render a verdict in the nonmoving

12   party's favor.  Anderson, 477 U.S. at 252, 257.  In determining whether a jury could reasonably

13   render a verdict in the nonmoving party's favor, the court must view the evidence in the light

14   most favorable to the nonmoving party and draw all justifiable inferences in its favor.  Id. at 255.

15   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

16   produce a factual predicate from which the inference may be drawn.  Dias v. Nationwide Life Ins.

17   Co., 700 F. Supp. 2d 1204, 1214 (E.D. Cal. 2010).

18        To establish a genuine dispute of material fact, a plaintiff must present affirmative

19   evidence; bald assertions that genuine issues of material fact exist are insufficient.  Galen v.

20   County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); see also F.T.C. v. Stefanchik, 559

21   F.3d 924 (9th Cir. 2009) ("A non-movant's bald assertions or a mere scintilla of evidence in his

22   favor are both insufficient to withstand summary judgment.").  Further, evidence that is merely

23   colorable or that is not significantly probative is not sufficient to withstand a motion for summary

24   judgment.  Anderson, 477 U.S. at 249-50 (citations omitted).  "Conclusory, speculative testimony

25   in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary

26   judgment."  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007); see also

27   Nelson v. Pima Community College, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("[M]ere allegation

28   and speculation do not create a factual dispute for purposes of summary judgment").  If the

1    nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled

2    to judgment as a matter of law." Celotex, 477 U.S. at 323.

3                                              DISCUSSION

4    A.    Evidentiary Problems

5             As already noted, plaintiff was provided with notice of the requirements for opposing a

6    motion for summary judgment pursuant to Rand v. Rowland, 154 F.3d 952, 953-54 (9th Cir.

7    1998) (en banc), and Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988). See ECF No.

8    47-3. This notice informed plaintiff that, to oppose a motion for summary judgment, she must set

9    out specific facts in declarations, depositions, answers to interrogatories, or authenticated

10   documents.

11            Notwithstanding this notice, plaintiff has not submitted any declarations with her

12   opposition, not even her own. Plaintiff's arguments are therefore limited to statements made in

13   her opposition, which is problematic since it is not signed under penalty of perjury. See 28

14   U.S.C. § 1746. Moreover, plaintiff attaches to her opposition over 250 pages of exhibits, none of

15   which are authenticated and many of which are submitted without explanation of context or

16   relevance. See Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773-75 (9th Cir. 2002) (finding

17   exhibits improperly authenticated and thus inadmissible and stating that "[a] trial court can only

18   consider admissible evidence in ruling on a motion for summary judgment"); see also Fed. R.

19   Evid. 901. Lastly, plaintiff (and, at times, defendant, see Thompson Decl. ¶ 33; Davis Decl. ¶ 6)

20   relies on statements made by other people, statements that are inadmissible as hearsay and that

21   are not subject to any exceptions to the rule against hearsay. See Fed. R. Evid. 801-804.

22            The Court recognizes that Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003),

23   provides that "at the summary judgment stage, we do not focus on the admissibility of the

24   evidence's form. We focus instead on the admissibility of its contents." See also Block v. City of

25   Los Angeles, 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary judgment, a party does

26   not necessarily have to produce evidence in a form that would be admissible at trial, as long as the

27   party satisfies the requirements of Federal Rules of Civil Procedure 56."). Fraser affirmed

28   consideration of hearsay contained in the plaintiff's diary on summary judgment because at trial,

                                                   23

1    the plaintiff's testimony of its contents would not be hearsay—the plaintiff could testify to the

2    portions of the diary from her personal knowledge, Fed. R. Evid. 602, use the diary to refresh her

3    recollection, Fed. R. Evid. 612, or even read the diary into evidence as a recorded recollection,

4    Fed. R. Evid. 803(5). <u>Fraser</u>, 342 F.3d at 1037.

5           In this case, despite the glaring evidentiary problems presented, the Court will assume for

6    the purposes of this motion, and without analyzing the propriety of each submitted evidentiary

7    item, that all of the evidence can be submitted in admissible form at trial.

8    B.     <u>Title VII Discrimination Claim</u>

9           Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for

10   an employer" to "discriminate against any individual with respect to" the "terms, conditions, or

11   privileges of employment, because of such individual's race, color, religion, sex, or national

12   origin." 42 U.S.C. § 2000e–2(a). A discrimination claim must be supported by direct evidence of

13   discrimination, or may instead be evaluated under the burden-of-proof-and production analysis

14   set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973).

15          Here, plaintiff has presented no direct evidence of disparate treatment by Thompson based

16   on either race or age. Thus, under the <u>McDonnell Douglas</u> analysis, she must first provide

17   sufficient evidence to establish a prima facie case of discrimination. If she succeeds, the burden

18   shifts to defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse

19   action. If defendant successfully carries that burden, the ultimate burden shifts to plaintiff to raise

20   a triable issue of material fact as to whether the proffered reasons for the adverse action are a

21   mere pretext for unlawful discrimination. <u>See</u> <u>Fonseca v. Sysco Food Servs. of Arizona, Inc.</u>, 374

22   F.3d 840, 850 (9th Cir. 2004). Notwithstanding the burden-shifting, the ultimate burden of proof

23   remains with plaintiff to show that defendant intentionally discriminated against her because of

24   her race and/or age. <u>Coleman v. Quaker Oats Co.</u>, 232 F.3d 1271, 1281 (9th Cir. 2000).

25          1.     <u>Prima Facie Case</u>

26          "Establishing a prima facie Title VII case in response to a motion for summary judgment

27   requires only minimal proof and does not even need to rise to the level of a preponderance of the

28   evidence." <u>Palmer v. Pioneer Assocs., Ltd.</u>, 338 F.3d 981, 984 (9th Cir. 2003) (internal citations

1   and quotations omitted).  To establish a prima facie case, the plaintiff must present evidence

2   showing: (1) she is a member of a protected class; (2) she was performing her job in a satisfactory

3   manner; (3) she suffered an adverse employment action; and (4) that similarly situated individuals

4   outside her protected class were treated more favorably, or other circumstances surrounding the

5   adverse employment action give rise to an inference of discrimination.  See, e.g., Zeinali v..

6   Raytheon Co., 636 F.3d 544, 552 (9th Cir. 2011).

7        Plaintiff has established that she is a member of a protected class as to both race and age[13]

8   and that she suffered an adverse employment action.  Nonetheless, the Court finds that plaintiff

9   cannot establish that she was performing her job in a satisfactory manner.  Instead, the undisputed

10  facts establish a pattern of poor performance, failure to communicate, failure to respond to

11  requests for information, and failure to guide and supervise subordinates.  Though plaintiff claims

12  to dispute some (though certainly not all) of defendant's evidence, her objections are, for the most

13  part, vague, relying on general statements of her accomplishments and failing to address the

14  particular incidents referenced by defendant.  For example, Thompson declares that sometime in

15  July or August 2007, plaintiff failed to bring up three specific issues at a weekly Regional

16  Management Team staff meeting, even after Thompson directed her to do so.  See Thompson

17  Decl. ¶ 13.  In opposition, although plaintiff states that she did inform the regional managers of

18  relevant issues, she does not refute that she failed to raise three issues at this specific meeting

19  after being directed by Thompson to raise them.  Pl.'s Opp'n at 6 ¶ F.  In another example,

20  Thompson submits evidence that plaintiff failed to respond to three emails sent by Richard

21  Stevenson to review a draft water service contract and provide finance-related feedback.

22  Thompson Decl. ¶ 18, Ex. B.  Rather than addressing her failure to respond, plaintiff states only

23  that she spoke with Stevenson, and Stevenson suggested several Finance Division employees to

24  help get the review completed.  Pl.'s Opp'n at 7 ¶ J.

25        Plaintiff also fails to show that similarly situated individuals outside her protected class

26  (whether based on race, age or color) were treated more favorably.  Rather, the weight of the

27

28  [13] The Court also will assume for the purposes of the present motion that plaintiff has established
    membership in a protected class based on color.

25

1    evidence, which is undisputed, establishes that Thompson managed all subordinates with the

2    same high expectations.  See Smith Decl. ¶ 6; Muehlberg Decl. ¶ 7; Close Decl. ¶ 2; McGinnis

3    Decl. ¶ 4 Bryant Decl. ¶ 5.  Plaintiff thus fails to establish a prima facie case of discrimination.

4            2.       Legitimate, Nondiscriminatory Reason

5            Assuming that plaintiff did establish a prima facie case, the Court also finds that defendant

6    has provided a legitimate, nondiscriminatory reason for the allegedly discriminatory actions.  "If

7    plaintiff[ ] establish[es] a prima facie case, the burden of production, not of persuasion, shifts to

8    the employer to articulate some legitimate, nondiscriminatory reason for the challenged action."

9    Hawn v. Exec. Jet Mgmt., Inc., 615 F.3d 1151, 1155 (9th Cir. 2010) (internal citations and

10   quotations omitted).  "If defendant meets this burden, plaintiff[ ] must then raise a triable issue of

11   material fact as to whether the defendant's proffered reasons for [the adverse action] are mere

12   pretext for unlawful discrimination."  Id.

13           Here, defendant has submitted extensive evidence of plaintiff's poor work performance,

14   which is a legitimate, nondiscriminatory reason for Thompson's conduct.  The undisputed facts

15   establish, inter alia, plaintiff's failure to respond to three emails sent by Richard Stevenson,

16   failure to timely provide two Managing for Excellence Plans, failure to explain the reasoning

17   behind what was determined to be an incorrect analysis on the San Luis Drainage Draft

18   Legislation, failure to participate in discussions leading up to a meeting with Reclamation's Chief

19   Financial Officer, failure to prepare an assigned presentation, failure to attend the Salt Lake City

20   meeting, and failure to guide and supervise subordinates.  See Aragon v. Repub. Silver State

21   Disposal, Inc., 292 F.3d 654, 660-61 (9th Cir. 2002) ("poor job performance" is a "legitimate,

22   nondiscriminatory reason for terminating . . . employment").  The burden now shifts back to

23   plaintiff to show pretext.

24           3.       Pretext

25           "A plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's

26   proffered explanation is unworthy of credence because it is internally inconsistent or otherwise

27   not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the

28   employer."  Noyes v. Kelly Servs., 488 F.3d 1163, 1171 (9th Cir. 2007) (internal citations,

1    quotations, and alterations omitted).  "All the evidence as to pretext—whether direct or indirect—

2    is to be considered cumulatively."  Id.

3         Defendant argues that plaintiff is unable to show that the proffered legitimate reasons are

4    pretextual in light of the "same actor inference."  The Ninth Circuit has held "that where the same

5    actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions

6    occur within a short period of time, a strong inference arises that there was no discriminatory

7    motive."  Bradley v. Harcourt, Brace & Co., 104 F.3d 267, 270-71 (9th Cir. 1996); see also

8    Coghlan v. Am. Seafoods Co. LLC, 413 F.3d 1090, 1096 (9th Cir. 2005) (extending Bradley's

9    pronouncement on the same-actor inference for "hiring and . . . firing" to cases where the

10   employee is "offered a less desirable job assignment" (quotation marks omitted)).  The same-

11   actor inference is "neither a mandatory presumption (on one hand) nor a mere possible conclusion

12   for the jury to draw (on the other hand)."  Coghlan, 413 F.3d at 1098.  Instead, "it is a 'strong

13   inference' that a court must take into account on a summary judgment motion."  Id.; see also

14   Bradley, 104 F.3d at 271-72.  The same actor inference can be overcome, however, if the plaintiff

15   provides "meaningful evidence that her supervisor harbored discriminatory animus," Johnson v.

16   Boys & Girls Clubs of S. Puget Sound, 191 Fed. App'x 541, 545 (9th Cir. 2006), or "evidence

17   suggesting that [the employer] developed a bias against [the protected class]" during the interval

18   between the favorable and unfavorable employment actions, Coghlan, 413 F.3d at 1097.

19        Here, it is undisputed that Thompson was responsible for hiring plaintiff.  It is also

20   undisputed that Thompson was responsible for the allegedly discriminatory conduct, culminating

21   in the permanent removal of plaintiff from the Financial Manager position.  The same-actor

22   inference therefore applies to the facts of this case, and plaintiff may only prevail on this motion

23   if she makes the "extraordinarily strong showing of discrimination" required to rebut the "same

24   actor" inference.  Coghlan, 413 F.3d at 1097.  Plaintiff, however, has not presented any evidence

25   to rebut this inference.  Rather, she relies on "[c]onclusory, speculative testimony in . . . [her]

26   moving papers[, which] is insufficient to raise genuine issues of fact and defeat summary

27   judgment."  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007); see also

28   Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 345 (9th Cir. 1995) (stating that

1   conclusory or speculative testimony is insufficient to raise a genuine issue of fact to defeat

2   summary judgment).  Although plaintiff contends that there was a high learning curve in her new

3   Financial Manager position, this does not negate the fact that Thompson, her supervisor, was

4   dissatisfied with plaintiff's multiple and documented performance issues many months into the

5   position.  Plaintiff also suggests that Thompson only hired her, an African American, to offset a

6   complaint of discrimination filed by another African American female.  See Pl.'s Opp'n at 10-11.

7   But as the ALJ noted during the administrative hearing:

8           The complainant's contention is illogical and unpersuasive.   It
            makes no sense whatsoever to conclude that Ms. Thompson would
9           have hired [plaintiff] because of her race and then, almost
            immediately, set out to abuse her because of her race. It seems
10          equally implausible that Ms. Thompson would have hired [plaintiff]
            because of her race and not because of her qualifications, thus
11          setting herself up for another EEO complainant from another
            African American employee if [plaintiff] was not successful and
12          eventually needed to be removed from the Financial Manager
            position.
13

14  Mack Decl. Ex. A at 17 n.5.

15          As plaintiff has failed to submit any evidence of pretext, summary judgment should be

16  entered on plaintiff's Title VII discrimination claim.

17  C.      Title VII Retaliation Claim

18          Plaintiff's retaliation claim similarly fails.  "To make out a prima facie case of retaliation,

19  an employee must show that (1) he [or she] engaged in a protected activity; (2) his [or her]

20  employer subjected him [or her] to an adverse employment action; and (3) a causal link exists

21  between the protected activity and the adverse action.'"  Ray v. Henderson, 217 F.3d 1234, 1240

22  (9th Cir. 2000); accord Rose v. Plastikon Indus., Inc., 537 Fed. Appx. 750, 751 (9th Cir. 2013);

23  see Univ. of Texas S.W. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013) ("a plaintiff making a

24  retaliation claim under [Title VII] must establish that his or her protected activity was a but-for

25  cause of the alleged adverse action by the employer").  The causal link "can be inferred from

26  temporal proximity between the protected activity and any adverse employment action or by

27  demonstrating that the person making the employment decision was aware that the plaintiff had

28  engaged in the protected activity."  Devi v. Oregon Dept. of Corrections, slip op., 2013 WL

1    3479566, at *7 (D. Or. July 9, 2013) (citing <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054,

2    1065 (9th Cir. 2002); <u>Yartzoff v. Thomas</u>, 809 F.2d 1371, 1376 (9th Cir. 1987) (citation

3    omitted)).  The <u>McDonnell Douglas</u> burden-shifting framework applies to plaintiff's retaliation

4    claim.  <u>See</u> <u>McGinest v. GTE Serv. Corp.</u>, 360 F.3d 1103, 1124 (9th Cir. 2004).  Thus, if plaintiff

5    establishes a prima facie case of retaliation, the burden shifts to defendant to offer a legitimate,

6    non-discriminatory explanation for the challenged actions.  <u>Dawson v. Entek Int'l</u>, 630 F.3d 928,

7    936 (9th Cir. 2011).  If defendant proffers such a reason, the burden shifts back to plaintiff to

8    show that defendant's reason is actually a pretext for discrimination.  <u>EEOC v. Boeing Co.</u>, 577

9    F.3d 1044, 1049 (citation and quotation omitted).

10         Plaintiff alleges that Thompson retaliated against her for her November 2007 meeting

11    with Mike Finnegan and later her formal EEO complaint.  The adverse employment action

12    plaintiff complains of includes Thompson's five-day suspension of plaintiff, Thompson's denial

13    of a within pay-grade raise, and Thompson's temporary and then permanent removal of plaintiff

14    from the Financial Manager position.  Plaintiff, however, cannot establish that her protected

15    activity was a but-for cause of Thompson's conduct.  Rather, as discussed supra, the undisputed

16    facts establish that Thompson was dissatisfied with plaintiff's extensively documented poor work

17    performance, much of which predated plaintiff's protected activity.  Plaintiff's statements in this

18    matter provide no more than her own speculative conclusion and argument that Thompson was

19    acting with discriminatory or retaliatory animus.  Because the record is devoid of evidence from

20    which a reasonable trier of fact could conclude that defendant's proffered reasons for Thompson's

21    conduct were merely a pretext for unlawful retaliation, summary judgment should also be entered

22    on plaintiff's Title VII retaliation claim.

23    D.     <u>Hostile Work Environment</u>

24         The Ninth Circuit has determined a three-part test for Title VII hostile work environment

25    claims.  Under this test, an employee "must show that (1) he was subject to verbal or physical

26    conduct due to his membership in a protected class; (2) that the conduct was unwelcome; and (3)

27    that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's

28    employment and create an abusive or hostile work environment."  <u>Gregory v. Widnall</u>, 153 F.3d

29

1071, 1074 (9th Cir. 1998).  The showing must satisfy both subjective and objective requirements; that is, the plaintiff must show that the plaintiff perceived the work environment to be hostile, and that a reasonable person in the plaintiff's position would have perceived it as hostile.  Brooks v. City of San Mateo, 229 F.3d 917, 923 (9th Cir. 2000).  The plaintiff must also prove that the hostility related to something prohibited by the applicable employment discrimination statute.  Thus, for example, a plaintiff claiming to have been subjected to a work environment that was hostile because it was permeated with sexually harassing comments or conduct must show that the harassment occurred "because of" the plaintiff's sex.  Id.; Nichols v. Azteca Rest. Enter., 256 F.3d 864, 874 (9th Cir. 2001).

Plaintiff's hostile work environment claim fails because, again, she has not submitted any evidence that Thompson's conduct was due to plaintiff's membership in a protected class rather than due to her poor work performance and the legitimate actions of a supervisor.  Accordingly, summary judgment should be entered on this claim.

Based on the foregoing, IT IS HEREBY RECOMMENDED that motion for summary judgment (ECF No. 47) be granted and this action be dismissed with prejudice.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: June 6, 2014

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE